United States District Court
Southern District of Texas
**ENTERED**
November 17, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WALEED  BIN AL-QARQANI, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-1807 |
| | § | |
| ARAB AMERICAN OIL COMPANY, *et al*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a proceeding to enforce a foreign arbitration award under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the Convention"). (Dkt. 77 at p. 2) Before the Court is Petitioners' Second Amended Petition for Enforcement of Foreign Arbitral Award against Respondent Saudi Arabian Oil Company ("Saudi Aramco"). (Dkt. 108) The parties have compiled and presented an extensive record and thorough briefing on the relevant issues, and the Court has reviewed all the parties' filings and documents submitted in the record.

The record establishes that, over the strenuous objections of the parties to an arbitration agreement, Petitioners, who are nonsignatories to this agreement, used the agreement to arbitrate a dispute that fell outside of the scope of the agreement. The arbitration proceeding was conducted in direct contravention of the agreement's explicit procedural terms and was so riddled with irregularities that it resulted in criminal convictions for several of the arbitrators involved. For the reasons discussed in greater

detail below, the Court will not confirm the arbitration award and Petitioners' motion (Dkt. 108) is **DENIED.**

## FACTUAL AND PROCEDURAL BACKGROUND

The petitioners claim to be "the private landowner and titleholders of plots of rich oil land located in Ras Tourna, Saudi Arabia." (Dkt. 77 at p. 4) They have initiated two proceedings, this case and a case in the Northern District of California ("the California case"), to confirm and enforce an $18 billion arbitration award that they obtained in Egypt against "Chevron Company of USA, Chevron Saudi Arabia[1] and Aramco" in 2015. (Dkt. 77 at pp. 3–4; Dkt. 77-2 at p. 6) The petitioners contend that an arbitral panel properly found that they own land on which the oil companies are conducting operations and that the oil companies owe the petitioners "rental value" for use of that land. (Dkt. 77 at p. 3) The claimed basis for the arbitral panel's jurisdiction is an arbitration clause contained in an agreement executed in 1933 ("the 1933 agreement" or "the Saudi Arabian Concession") by the Saudi Arabian government ("the Government") and Standard Oil Company of California ("SoCal") under which the Government gave SoCal "the absolute right for a period of sixty years" to, among other things, search for oil in Saudi Arabia. (Dkt. 77-1 at p. 3) The arbitration clause was Article 31 of the 1933 agreement. (Dkt. 77-1 at pp. 16–17)

---

[1] The Court will collectively refer to all companies with "Chevron" in their names as "the Chevron entities." The Chevron entities were the respondents in the California case.

According to the petitioners' translation of the 1933 agreement,[2] the arbitration clause stated:

> Should any doubt, difficulty or difference arise between the Government and the Company in interpreting this Agreement, the execution thereof or the interpretation or execution of any of it or with regard to any matter that is related to it or the rights of either of the two parties or the consequences thereof, and the two parties fail to agree on the settlement of the same in another way, then the issue shall be referred to two arbitrators with each party appointing one of the two arbitrators and with the two arbitrators appointing an umpire prior to proceeding to arbitration. Each party shall appoint its arbitrator within thirty days of the date of the application made to it in writing by the other party. Should the two arbitrators fail to appoint the umpire, then the Government and the Company shall at that point

---

[2] The parties agree that the 1933 agreement was signed in two iterations, one in Arabic and one in English. (Dkt. 111 at pp. 40–41; Dkt. 119 at pp. 26–27) The petitioners concede that they have not provided the English-language version and have instead provided an English translation of the Arabic-language version. (Dkt. 119 at pp. 26–27) Saudi Aramco does not agree that the translation is accurate. (Dkt. 111 at p. 12) The petitioners' translation of the 1933 agreement notably stipulates that "the English version shall prevail"—and, again, the Court does not have the English version—if there is "a difference on the interpretation relating to the Company's obligations[.]" (Dkt. 77-1 at p. 18) The Court finds that, under these circumstances, the petitioners' failure to provide the original or a duly certified copy of the English-language version of the 1933 agreement warrants the denial of this petition under Article IV of the Convention, which allows a petitioner to rely on a translation to prove up the pertinent arbitration agreement only "[i]f the . . . agreement is not made in an official language of the country in which the award is relied upon[.]" *See* 21 U.S.T. at 2519–20. Judge White of the Northern District of California, after examining the same documents that the petitioners presented to this Court, concluded in the California case that denial was required under Article IV. *Al-Qarqani v. Chevron Corp.*, No. 4:18-CV-3297, 2019 WL 4729467, at *5 (N.D. Cal. Sept. 24, 2019). Judge White's holding that a failure to comply with Article IV of the Convention mandates denial of a petition to enforce an arbitration award is persuasive and supported by caselaw. *See China Minmetals Materials Import and Export Company, Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 293–94 (3d Cir. 2003) (Alito, J., concurring) ("The better reading of Article IV—which comports with fundamental principles of arbitration—requires that the party seeking enforcement both (1) supply a document purporting to be the agreement to arbitrate the parties' dispute and (2) prove to the court where enforcement is sought that such document is in fact an 'agreement in writing' within the meaning of Article II, Section 2. In the present case, accordingly, [the petitioner] was required to demonstrate to the District Court that an officer of [the respondent] signed the purported nickel contracts."). Nevertheless, the Court will proceed to address this petition under the assumption that the petitioners' translation is accurate and sufficient to satisfy Article IV of the Convention. Assuming the accuracy and sufficiency of their translation, the petitioners still do not prevail.

appoint an umpire by consent and should both of them fail to agree, then they should apply to the President of the Permanent International Court of Justice to appoint an umpire. The award passed by the two arbitrators in the case shall be final. However, if they failed to agree, then the award of the arbitrators in the case shall be final.[3] As regards the place of arbitration, the two parties shall agree on it and if they failed to agree to that then it shall be in the Hague (Holland).

Dkt. 77-1 at pp. 16–17.

The 1933 agreement defined "the Government" as "the Government of Saudi Arabia" and defined "the Company" as "Standard Oil of California Company[.]" (Dkt. 77-1 at p. 3) The 1933 agreement specified that it was an "[a]greement . . . between the Government and the Company[.]" (Dkt. 77-1 at p. 3) No other party was included in the agreement, except that: (1) SoCal could "assign its rights or obligations specified in this Agreement" with the Government's consent; and (2) SoCal could "transfer its rights and obligations provided for in this agreement to a company to be set up by it for this project after notifying the Government of the same." (Dkt. 77-1 at pp. 3, 17) It is undisputed that the petitioners are nonsignatories to the 1933 agreement. It is further undisputed that Saudi Aramco, which did not exist in 1933, is a nonsignatory to the 1933 agreement.

In claiming the right to invoke the arbitration provisions of the 1933 agreement, the petitioners argue that the arbitration provisions were incorporated into a separate agreement signed sixteen years later by the petitioners' ancestors and a subsidiary of

---

[3] This sentence is difficult to comprehend in the context of the arbitration clause and may be a mistranslation; it seems that the phrase "award of the arbitrators" should read "award of the umpire." Elsewhere in the record, this part of the arbitration clause is quoted as using the term "deciding arbitrator" instead of the term "umpire" and saying that "[t]he ruling of the two arbitrators shall be considered absolute; if they do not agree among themselves in opinion, then the ruling of the deciding arbitrator shall be considered final." (Dkt. 111-4 at pp. 113–14) The possible mistranslation has no effect on the Court's reasoning but does help illustrate why the English version of the 1933 agreement is required to sufficiently prove up the agreement to arbitrate under Article IV of the Convention.

SoCal. Under Article 25 of the 1933 agreement, the Government authorized SoCal "to obtain from the owner of the land the surface rights of the lands which the Company deem[ed] necessary for use in its works pertaining to this project, provided that the Company [was required to] pay to the occupant of the lands an allowance in consideration for abandoning the use of such lands." (Dkt. 77-1 at p. 14) In 1949, the petitioners' ancestors transferred land rights to a SoCal subsidiary, Arabian American Oil Company ("Aramco"),[4] as part of the petroleum exploration project. (Dkt. 77-3) The transfer was memorialized in a deed ("the 1949 deed"). (Dkt. 77-3) The petitioners contend that the following language from the 1949 deed incorporated the arbitration provisions of the 1933 agreement:

> For the good and valuable consideration to be paid to us, we the undersigned, for our property under the Deed No. 124, in connection with the Plots of Land stated in such Deed, we hereby give and transfer, each for himself and on behalf of his heirs, guardians and lawful representatives, to the Arab American Oil Company, being the Company referred to in the said Deed, its successor and whomever it appoints, the right to use and occupy the mentioned Plots of Land, for the purposes of the Saudi Arabian Concession,[5] concluded on 4 Safar 1352 H., corresponding to 29 July 1933 G. and any additional agreements that may be annexed thereto. We hereby declare and affirm that the rights of the said Company, as to using and occupying the said Plots of Land, are based on the requirements of Article (25) of the said Concession, and we hereby further agree to safeguard the said Company, its successors and whomever it may appoint, against all claims, in the past, at present and in future, by any person claiming ownership or interest in any one of the said Plots of Land.
> Dkt. 77 at p. 6; Dkt. 77-3 at p. 6.

---

[4] SoCal assigned the 1933 agreement to a subsidiary, California Arabian Standard Oil Company, which changed its name to Arabian American Oil Company. (Dkt. 111-2 at pp. 27–31)
[5] The parties agree that the reference to the "Saudi Arabian Concession" is a reference to the 1933 agreement. (Dkt. 77 at p. 6; Dkt. 111 at p. 13)

The 1949 deed made no explicit reference to either arbitration or Article 31 of the 1933 agreement.

During the decades after the execution of the 1949 deed, the Government began buying Aramco's assets. (Dkt. 111-1 at pp. 136, 140) By 1988, the Government had bought all of Aramco's assets and had created Saudi Aramco. (Dkt. 111-1 at pp. 136, 140, 159, 161) Aramco dissolved in 1990. (Dkt. 111-1 at pp. 175, 205)

In 2011, more than sixty years after the execution of the 1949 deed, the petitioners initiated legal proceedings against Saudi Aramco in the Saudi Arabian courts, contending that the 1949 deed memorialized a lease, not a sale. (Dkt. 111-1 at pp. 13–14, 243–44, 296–97) The petitioners' characterization of the 1949 transaction as a lease rather than a sale provides the foundation for their contentions that they now own the land discussed in the 1949 deed and that Saudi Aramco and the Chevron entities owe the petitioners "rental value" for the period beginning at the time the 1933 agreement expired. (Dkt. 77 at p. 3) A Saudi Legal Committee and the President of the Council of Ministers rejected the petitioners' claim and found that the 1949 deed memorialized a sale. (Dkt. 111-1 at pp. 13–14, 243–44, 296–97) The proceedings determined that the Government, which had long since bought all of Aramco's assets, owned the land discussed in the 1949 deed. (Dkt. 111-1 at pp. 13–14, 243–44, 296–97)

The petitioners then initiated an arbitration proceeding in Egypt against Saudi Aramco and the Chevron entities using an entity called the International Arbitration Center ("IAC"). After receiving notice of the arbitration from the IAC, Saudi Aramco wrote a letter to the IAC saying that it would not participate. (Dkt. 128-4 at p. 140) In its

letter, Saudi Aramco "reject[ed] the arbitration" as "null and void in [its] entirety." (Dkt. 128-4 at p. 140) Saudi Aramco stated in its letter that it had no arbitration agreement with the petitioners and that the land discussed in the 1949 deed belonged to the Government. (Dkt. 128-4 at p. 140) In a letter of their own, the Chevron entities also objected to the arbitration and argued that no valid arbitration agreement between them and the petitioners existed, though the Chevron entities, "as a precautionary measure," nominated an arbitrator. (Dkt. 111-4 at p. 37) Over these protests, the petitioners pushed forward with the IAC arbitration in Egypt.

Even setting aside the fact that every single respondent vigorously objected to the proceeding and denied the existence of any arbitration agreement, the IAC arbitration progressed in a manner that can only be described as concerning. At least three arbitrators resigned during the proceeding, with two of them doing so via a joint letter that expressed a "lack of confidence in the ability of [the IAC] to be entrusted with the administration of the required arbitration." (Dkt. 77-2 at pp. 9–17; Dkt. 111-4 at p. 53) Remarkably, one of the arbitrators who signed the joint resignation letter expressing a lack of confidence in the IAC had been selected *by* the IAC on behalf of the petitioners. (Dkt. 77-2 at p. 9; Dkt. 111-4 at p. 53) At least seven different arbitrators ultimately participated in the proceeding at one point or another, and at least three different combinations of arbitrators filled the three seats on the arbitration panel. (Dkt. 77-2 at pp. 9–17) The disjointed proceeding produced a disjointed result: the tribunal issued an opinion holding that it lacked jurisdiction over the dispute, then, with different members, reopened the arbitration and issued a second opinion holding not only that it had jurisdiction but that

the petitioners were entitled to $18 billion. (Dkt. 77-2; Dkt. 111-4 at pp. 104–15) Perhaps most telling, the second opinion also held that the IAC itself was entitled to "arbitration fees" totaling 1/8 of one percent "of the total value of the Claims of the [petitioners]"— about $23 million. (Dkt. 77-2 at p. 35)

The second opinion, and in particular the IAC's award of a staggeringly large fee to itself, attracted the attention of Egyptian prosecutors, who concluded that the second opinion was part of a "criminal plan" to "obtain the arbitration fees, representing a percentage of the award[.]" (Dkt. 111-3 at pp. 87, 105–06) An Egyptian court convicted two IAC administrators and three arbitrators of fraud, forgery, and similar crimes for their roles in reopening the arbitration and issuing the $18 billion award. (Dkt. 111-3 at pp. 203–15) The Egyptian court found that, "[d]espite the fact that an award definitively ending the fabricated case—which concluded that the Arbitration Tribunal did not have jurisdiction to hear it—had already been issued, the [IAC administrators and arbitrators] nevertheless insisted on issuing [a] falsified award" with the aim of "fabricat[ing] a proof of debt against the . . . companies in order to misappropriate their assets." (Dkt. 111-3 at pp. 203–04)

It is not surprising that the petitioners' quest to confirm their award has thus far come up empty. Two federal district judges have examined the award, and neither confirmed it. The California case, in which the petitioners named various Chevron entities as respondents, has been dismissed in its entirety by Judge White of the Northern District of California and is on appeal before the Ninth Circuit. *See Al-Qarqani v. Chevron Corp.*, No. 4:18-CV-3297, 2019 WL 4729467 (N.D. Cal. Sept. 24, 2019); *see*

*also* Ninth Circuit Docket Number 19-17074. In this case, in which the petitioners originally named Aramco Services Company ("ASC") and Aramco as respondents, Judge Miller of the Southern District of Texas granted ASC's motion to dismiss because "ASC is not bound to the arbitration agreement and none of the theories to bind a nonsignatory apply." (Dkt. 47 at p. 7) The dismissal rulings by Judge Miller and Judge White left as the lone remaining named respondent Aramco, which, as Judge Miller noted, dissolved 25 years before the arbitration proceeding at issue. (Dkt. 47 at p. 1) This case was then reassigned to the undersigned judge.

Since Aramco has not existed for decades, the petitioners sought leave from the Court to amend their petition to name Saudi Aramco as a respondent. (Dkt. 50 at p. 14) The Court granted leave to amend. (Dkt. 55)

## THE NEW YORK CONVENTION

United States District Courts have federal question jurisdiction over petitions to confirm awards under the Convention. *See* 9 U.S.C. § 203; *see also* 28 U.S.C. §1331. The text of the Convention is contained at pages 2517 to 2566 of Volume 21 of a United States Department of State publication entitled United States Treaties and Other International Agreements. *See* 21 U.S.T. 2517. The legislation implementing the Convention is contained in Chapter 2 of the Federal Arbitration Act ("the FAA"). *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020).

An action to confirm an international arbitration award is not "an ordinary civil action" but "a summary procedure in the nature of federal motion practice[.]" *Imperial*

*Ethiopian Government v. Baruch-Foster Corp.*, 535 F.2d 334, 335, 337 & n.2 (5th Cir. 1976). "The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. The Court has examined the evidence in the record and will not confirm the IAC arbitration award. The Court finds that the following three grounds for refusal to confirm exist:

(1) There was no agreement to arbitrate between the petitioners and Saudi Aramco;

(2) The question of whether the 1949 deed memorialized a lease or a sale fell outside the scope of the arbitration clause invoked by the petitioners; and

(3) The IAC proceeding did not conform to the procedures outlined in the arbitration clause invoked by the petitioners.

### A. The Court will not confirm the petitioners' award because there was no agreement to arbitrate between the petitioners and Saudi Aramco.

In United States federal courts, the absence of a valid agreement to arbitrate is a ground for refusing to confirm an arbitration award under the Convention. *In re Arbitration between Exceed International Limited v. DSL Corp.*, No. 4:13-CV-2572, 2014 WL 1761264, at *4–5 (S.D. Tex. Apr. 30, 2014) (Atlas, J.) (discussing *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005); *China Minmetals Materials Import and Export Company, Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 286 (3d Cir. 2003); and *VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II, L.P.*, 717 F.3d 322, 325 (2d Cir. 2013)). That ground for refusal is found in Article V(2) of the

Convention, which provides that a United States federal court is not required to confirm an award when the subject matter of the parties' difference is not capable of settlement by arbitration under United States law or when enforcement would be contrary to the public policy of the United States. *Id*.; *see also* Article V(2) of the Convention, 21 U.S.T. at 2520 ("Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country . . . or . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country."). Under United States law, a valid agreement to arbitrate is a prerequisite for an enforceable arbitration award; and the enforcement of an arbitration award when there was no valid agreement to arbitrate is contrary to the public policy of the United States. *Exceed*, 2014 WL 1761264 at *4–5.

Here, there was no agreement to arbitrate. The petitioners rely on the arbitration provisions of the 1933 agreement to establish the existence of an arbitration agreement between them and Saudi Aramco. It is undisputed that the petitioners and Saudi Aramco are nonsignatories to the 1933 agreement. Although nonsignatories can, under certain circumstances, enforce and be bound by arbitration agreements, the petitioners here cannot enforce the arbitration provisions of the 1933 agreement, even assuming that Saudi Aramco is bound by those provisions.

As a preliminary matter, the Court notes that Chapter 1 of the FAA applies to proceedings that are brought under Chapter 2 to the extent that Chapter 1 is not in conflict with Chapter 2 or the Convention. *GE Energy*, 140 S. Ct. at 1644; *see also* 9 U.S.C. §

208. Chapter 1 and Chapter 2 are not in conflict on the question of whether a nonsignatory to an arbitration agreement, like petitioners and Saudi Aramco here, can invoke or be bound by that agreement. *Todd v. Steamship Mutual Underwriting Association (Bermuda) Limited*, 601 F.3d 329, 334–35 & n.10 (5th Cir. 2010). Rather, "in both FAA and Convention cases, courts have largely relied on the same common law contract and agency principles to determine whether nonsignatories must arbitrate[.] Consequently, . . . cases discussing whether nonsignatories can be compelled to arbitrate under the FAA are relevant for this case governed by the New York Convention." *Id.* at 334–35.

"The federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008) (quotation marks omitted). Moreover, "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003). So, "[w]here the very existence of any agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract." *Will-Drill Resources, Inc. v. Samson Resources Company*, 352 F.3d 211, 218 (5th Cir. 2003). "Courts addressing whether a non-signatory can enforce an arbitration agreement are guided by traditional principles of state law, which allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."

*Halliburton Energy Services, Inc. v. Ironshore Specialty Insurance Company*, 921 F.3d 522, 531 (5th Cir. 2019) (quotation marks omitted).

With these bedrock guidelines in mind, the Court will analyze the question of whether the petitioners can invoke the arbitration provisions of the 1933 agreement using "Texas law, which is the law of the forum, there having been no showing that the law of any other arguably more appropriate state materially differs in respect to the present issue." *Morrison*, 517 F.3d at 254; *see also Exceed*, 2014 WL 1761264 at *6–7 (applying Texas law in a proceeding to enforce an arbitration award under the Convention). Under Texas law, "[w]ho is bound by an arbitration agreement is normally a function of the parties' intent, as expressed in the agreement's terms." *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 633 (Tex. 2018). When addressing the matter of whether nonsignatories are bound by an arbitration agreement, Texas courts "endeavor to keep [Texas substantive law] consistent with federal law." *In re Labatt Food Service, L.P.*, 279 S.W.3d 640, 643 (Tex. 2009). Drawing on federal law, the Texas Supreme Court has "articulated six scenarios in which arbitration with non-signatories may be required: (1) incorporation by reference, (2) assumption, (3) agency, (4) alter ego, (5) equitable estoppel, and (6) third-party beneficiary." *Jody James Farms*, 547 S.W.3d at 633; *see also In re Kellogg Brown & Root Inc.*, 166 S.W.3d 732, 739 (Tex. 2005).

The petitioners have provided a lengthy discourse on Texas contract law but have not put forward a viable basis on which they can establish entitlement to enforce the arbitration provisions of the 1933 agreement. (Dkt. 119 at pp. 11–24) They argue that the following three principles listed in *Jody James Farms* allow them to enforce the

arbitration provisions: incorporation by reference; equitable estoppel; and third-party beneficiary. (Dkt. 119 at pp. 16–22) The petitioners also argue, citing *Labatt*, that their claims are derivative of the Government's rights. (Dkt. 119 at pp. 22–23) The Court disagrees with all of the petitioners' contentions.

> ### i.      *Incorporation by reference*

The first principle allowing nonsignatory enforcement that the petitioners invoke is incorporation by reference. The petitioners argue that the 1949 deed incorporated the arbitration provisions of the 1933 agreement through the two references to the 1933 agreement in the following language:

> For the good and valuable consideration to be paid to us, we the undersigned, for our property under the Deed No. 124, in connection with the Plots of Land stated in such Deed, we hereby give and transfer, each for himself and on behalf of his heirs, guardians and lawful representatives, to the Arab American Oil Company, being the Company referred to in the said Deed, its successor and whomever it appoints, the right to use and occupy the mentioned Plots of Land, for the purposes of the Saudi Arabian Concession, concluded on 4 Safar 1352 H., corresponding to 29 July 1933 G. and any additional agreements that may be annexed thereto. We hereby declare and affirm that the rights of the said Company, as to using and occupying the said Plots of Land, are based on the requirements of Article (25) of the said Concession, and we hereby further agree to safeguard the said Company, its successors and whomever it may appoint, against all claims, in the past, at present and in future, by any person claiming ownership or interest in any one of the said Plots of Land.
> Dkt. 77 at p. 6; Dkt. 77-3 at p. 6.

The Court finds this argument unpersuasive. Under Texas law, a party arguing that a contract incorporated an arbitration provision from another contract must show "express incorporation of binding arbitration" and a "clear, unequivocal and unconditional agreement to arbitrate[.]" *Cerveceria Cuauhtemoc Moctezuma S.A. de C.V.*

*v. Montana Beverage Co.*, 330 F.3d 284, 287 (5th Cir. 2003); *see also Seale v. Roy M. Mitchell Contracting Co.*, 321 S.W.2d 149, 150–51 (Tex. Civ. App.—Austin 1959, writ ref'd)[6] (holding that contracting parties will be deemed to have incorporated the arbitration provisions of a separate contract "only when the terms of their contract are clear and certain in showing that they had such intention"). Neither the "Saudi Arabian Concession" reference nor the more specific reference to Article 25 of the 1933 agreement was sufficient to incorporate the arbitration provisions of the 1933 agreement.

Take the reference to Article 25. In its entirety, Article 25 read:

> The Government authorizes to [sic] company to obtain from the owner of the land the surface rights of the lands which the Company deems necessary for use in its works pertaining to this project, provided that the Company shall pay to the occupant of the lands an allowance in consideration for abandoning the use of such lands. However, the amount to be paid to it (occupant) must be fair and based on the benefit which the occupant of the land obtains from it. The Government shall extend to the Company all reasonable assistance in case of difficulties arising out of obtaining the rights from the occupant of the surface of the land. Naturally, the Company shall have no right to obtain the holy sites nor occupy them. Dkt. 77-1 at p. 14.

Incorporation of this language, which only discusses the acquisition and transfer of surface rights to land, did not constitute incorporation of any arbitration provisions. The 1933 agreement's arbitration provisions were contained in Article 31, not Article 25, and Article 25 of the 1933 agreement did not mention either Article 31 or arbitration. (Dkt. 77-1 at pp. 14, 16–17) Furthermore, the language from the 1949 deed did not mention

---

[6] The Texas Supreme Court assigned *Seale* a "writ ref'd" notation, which means that, although the opinion was issued by an intermediate appellate court, the Texas Supreme Court adopted the opinion and judgment as its own. *In re Smith Barney, Inc*., 975 S.W.2d 593, 596 (Tex. 1998). In other words, *Seale* has the same precedential weight as an opinion of the Texas Supreme Court.

either arbitration or Article 31 of the 1933 agreement; and Article 31 of the 1933 agreement did not mention arbitration involving anyone but the Government and SoCal. (Dkt. 77-1 at pp. 16–17; Dkt. 77-3 at p. 6) The Court finds that these arguments attempting to link the 1949 deed to Article 31 of the 1933 agreement through a reference in the 1949 deed to Article 25 of the 1933 agreement cannot establish a "clear, unequivocal and unconditional agreement to arbitrate" under Texas law. *Cerveceria,* 330 F.3d at 287.

The petitioners also cannot rely on the "Saudi Arabian Concession" reference, meaning the 1949 deed's statement that it transferred to Aramco "the right to use and occupy the mentioned Plots of Land, for the purposes of the Saudi Arabian Concession[.]" (Dkt. 77-3 at p. 6) Read in context, the "Saudi Arabian Concession" reference was merely another reference to Article 25.

*Seale* provides a helpful analogy. In *Seale*, a contractor argued that a subcontract incorporated the arbitration provisions of a principal contract, even though the principal contract only "contained provisions for arbitrating disputes between the [contractor's client] and [the contractor.]" *Seale*, 321 S.W.2d at 149–50. The contractor based his argument on language in the subcontract providing that the subcontractor would "comply with all terms and conditions pertaining to his part of the work as contained in the [principal] contract . . . , as attached to the plans and specifications and made a part of the contract of which is herein included in this agreement." *Id*. at 150 (emphasis removed). The *Seale* Court disagreed with the contractor and held that "the only terms and provisions of the main contract incorporated in the subcontract by its terms were those

provisions which relate to the performance of the work [the subcontractor] contracted to do." *Id*. at 151. "The arbitration provisions d[id] not fit th[at] classification." *Id*. Accordingly, there was "no clear incorporation of the arbitration provisions of the principal contract into the subcontract[.]" *Id*.

So it is here with the "Saudi Arabian Concession" reference; the reference incorporated, if anything, only the terms of the 1933 agreement discussing Aramco's "right to use and occupy the mentioned Plots of Land"—namely, Article 25. (Dkt. 77-3 at p. 6) The arbitration provisions of Article 31, which only contained provisions discussing dispute resolution between the Government and SoCal, were certainly not clearly included in that reference. The "Saudi Arabian Concession" reference did not demonstrate a clear incorporation of the 1933 agreement's arbitration provisions into the 1949 deed.

Under these circumstances, the 1949 deed's two references to the 1933 agreement did not constitute an express incorporation of binding arbitration or a clear, unequivocal, and unconditional agreement to arbitrate.

### ii.    *Equitable estoppel*

The petitioners next argue that they may enforce the arbitration provisions of the 1933 agreement under the principle of equitable estoppel. (Dkt. 119 at pp. 12, 19–21) Equitable estoppel is a matter of judicial discretion and can be a difficult doctrine to articulate and apply in the arbitration context. *Bridas*, 345 F.3d at 360–61 & n.12; *see also Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 531 (5th Cir. 2000) (Dennis, J., dissenting) (quoting 4 Richard A. Lord, Williston on Contracts § 8.5, at 73

(4th ed. 1992)) ("[N]early anything can be called estoppel. When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel."). Even so, the caselaw defines two specific theories of equitable estoppel mentioned by the petitioners: "direct benefits" estoppel and "intertwined claims" estoppel. (Dkt. 119 at pp. 12, 19–21) "Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause." *Bridas*, 345 F.3d at 361–62 (quotation marks omitted). Under the intertwined claims estoppel theory, "non-signatories can successfully compel arbitration when (1) they have a close relationship with a signatory to a contract with an arbitration agreement and (2) the claims are intimately founded in and intertwined with the underlying contract obligations." *Jody James Farms*, 547 S.W.3d at 639 (quotation marks omitted).

Regardless of the name the petitioners use for it, the Court declines to apply any equitable estoppel theory here for one fundamental reason: no one has sued the petitioners on the 1933 agreement. Equitable estoppel theories exist to prevent a "*plaintiff* from relying upon the *defendants'* status as a nonsignatory to prevent the *defendants* from compelling arbitration under the agreement." *Bridas*, 345 F.3d at 360 (emphasis on first two italicized words added); *see also Jody James Farms*, 547 S.W.3d at 637 ("In the archetypal direct-benefits case, the party *opposing* arbitration seeks to enforce the terms of an agreement with an arbitration clause.") (emphasis added). Courts applying equitable estoppel recognize that a "plaintiff cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is

a nonsignatory." *Bridas*, 345 F.3d at 361. That did not happen here; no plaintiff ever sought to hold the petitioners liable pursuant to duties imposed by the 1933 agreement. In the 2011 proceedings in the Saudi Arabian courts, the petitioners were the ones seeking to hold Saudi Aramco liable—and those proceedings were based on the 1949 deed.

Recognizing this problem, the petitioners argue that "Aramco and Saudi Aramco" have sought indemnity from the petitioners in the past for "harm, encumbrances, or damages they do to the land or third-party adjacent lands." (Dkt. 119 at p. 21) The petitioners point to letters in the record that they claim show that Aramco and Saudi Aramco "have been sued in Saudi Courts for damages" in the past and have asked the petitioners "to pay for damages and indemnify them, or defend them in Saudi Court." (Dkt. 119 at p. 21; Dkt. 121-2) However, the letters provided by the petitioners do not show that anyone, much less Aramco or Saudi Aramco specifically, ever invoked the 1933 agreement against them; when the letters requested indemnification, they did so pursuant to the 1949 deed. (Dkt. 121-2 at pp. 7, 29, 31) The 1933 agreement did not even contain any provisions addressing indemnification of SoCal, the Government, or their successors by landowners. (Dkt. 77-1) The petitioners' equitable estoppel argument, in other words, is a recasting of their already-rejected argument that the 1949 deed incorporated the 1933 agreement by reference. Accordingly, the Court will not apply equitable estoppel to allow the petitioners to invoke the arbitration provisions of the 1933 agreement.

### iii.    Third-party beneficiary

The petitioners next argue that they can enforce the arbitration provisions of the 1933 agreement using the third-party beneficiary doctrine. (Dkt. 119 at pp. 21–22) The Court also finds this argument unpersuasive.

"Parties are presumed to be contracting for themselves only. This presumption may be overcome only if the intent to make someone a third-party beneficiary is clearly written or evidenced in the contract." *Bridas*, 345 F.3d at 362 (citation and quotation marks omitted). Texas third-party beneficiary law comports with the Fifth Circuit's general statement in *Bridas*:

> Like other contracts, arbitration agreements may also be enforced by third-party beneficiaries, so long as the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit. The benefit must be more than incidental, and the contracting parties' intent to confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Whether the third party intended or expected to benefit from the contract is irrelevant, because only the intention of the contracting parties in this respect is of controlling importance.
> *Jody James Farms*, 547 S.W.3d at 635 (footnotes and quotation marks omitted).

The petitioners do not specify any language in the 1933 agreement indicating that the Government and SoCal entered into the 1933 agreement directly for the petitioners' benefit, and the Court can find no such language on its own. The provisions of Article 25 regarding the acquisition of surface rights did nothing more than allocate the responsibilities for such acquisition between the Government and SoCal; they did not, for instance, "identify a specific sum which the [Government and SoCal were to] pay to a certain person or entity" or "illustrate a clear intent to repay a debt owed[,]" so they

cannot rebut the presumption that the Government and SoCal contracted for themselves only. *Tawes v. Barnes*, 340 S.W.3d 419, 426–29 (Tex. 2011) ("The [oil and gas operating] Agreements demonstrate that the clear intent of the signatories thereto was to allocate responsibilities for the payment of operating expenses for the specific purpose of maintaining each . . . lease, not to directly benefit [a nonsignatory lessor who was claiming third-party beneficiary status]."); *see also Brown v. Fullenweider,* 52 S.W.3d 169, 170 (Tex. 2001) (holding that a decree of divorce was not a third-party beneficiary agreement in favor of one party's attorney because the decree did not name the attorney and merely allocated responsibility for the payment of his fees, along with other financial obligations, between the parties). At best, the petitioners were incidental beneficiaries of the 1933 agreement, which does not entitle them to utilize the third-party beneficiary doctrine.

### iv.    Derivative claims

Finally, the petitioners argue that they can enforce the arbitration provisions of the 1933 agreement because their claims are derivative of the Government's rights. (Dkt. 119 at pp. 22–23) For this proposition, the petitioners cite *Labatt*, in which the Texas Supreme Court held that wrongful death beneficiaries are bound by a decedent's agreement to arbitrate because the beneficiaries "stand in [the decedent's] legal shoes[.]" *Labatt*, 279 S.W.3d at 645–47.

The Court disagrees with petitioners' argument. The principle established by *Labatt* is not applicable under the facts of this case. The Texas wrongful-death statutes provide a "right of statutory beneficiaries to maintain a wrongful death action [that] is

entirely derivative of the decedent's right to have sued for his own injuries immediately prior to his death." *Id*. at 644. By contrast, the petitioners' claims were in no way derivative of any claimed right of the Government to sue for unpaid rent. To the contrary, the petitioners have consistently argued that they, and not the Government, own the land discussed in the 1949 deed. In fact, the reason the petitioners initiated this arbitration in the first place was to circumvent the findings of a Saudi Legal Committee and the President of the Council of Ministers that the Government owns the land at issue. (Dkt. 111-1 at pp. 13–14, 243–44, 296–97) Under these facts, the petitioners cannot use *Labatt* to establish an agreement to arbitrate.

There was no agreement to arbitrate between the petitioners and Saudi Aramco. Accordingly, under Article V(2) of the Convention, the Court refuses to confirm the petitioners' arbitration award.

**B. The Court will not confirm the petitioners' award because the question of whether the 1949 deed memorialized a lease or a sale fell outside the scope of the arbitration clause invoked by the petitioners.**

A second ground for refusing to confirm an award under the Convention is listed in Article V(1)(c). Under Article V(1)(c), a court may refuse to confirm an award upon "proof that . . . [t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration[.]" *See* 21 U.S.T. 2520. That ground applies here.

As Judge White found in the California case, the scope of the 1933 agreement "was limited to the grant of rights in the extraction of hydrocarbons on public and private

lands as granted by the Kingdom of Saudi Arabia." *Chevron*, 2019 WL 4729467 at *7. The 1933 agreement's arbitration clause "does not purport to cover a dispute concerning money allegedly owed under a deed transferring private rights and the title of land to another party." *Id*. The Court agrees with Judge White. The question of whether the 1949 deed memorialized a lease or a sale fell outside the scope of the 1933 agreement's arbitration provisions. Accordingly, under Article V(1)(c) of the Convention, the Court refuses to confirm the petitioners' arbitration award.

### C. The Court will not confirm the petitioners' award because the IAC proceeding did not conform to the procedures outlined in the arbitration clause invoked by the petitioners.

A third ground for refusing to confirm an award under the Convention is listed in Article V(1)(d). Under Article V(1)(d), a court may refuse to confirm an award upon "proof that . . . [t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties[.]" *See* 21 U.S.T. 2520. That ground applies here.

The arbitration provisions of the 1933 agreement explicitly set out an *ad hoc* process whereby:

> the issue shall be referred to two arbitrators with each party appointing one of the two arbitrators and with the two arbitrators appointing an umpire prior to proceeding to arbitration. Each party shall appoint its arbitrator within thirty days of the date of the application made to it in writing by the other party. Should the two arbitrators fail to appoint the umpire, then the Government and the Company shall at that point appoint an umpire by consent and should both of them fail to agree, then they should apply to the President of the Permanent International Court of Justice to appoint an umpire. The award passed by the two arbitrators in the case shall be final. However, if they failed to agree, then the award of the arbitrators in the

case shall be final.[7] As regards the place of arbitration, the two parties shall agree on it and if they failed to agree to that then it shall be in the Hague (Holland).

Dkt. 77-1 at pp. 16–17.

As Judge White succinctly found in the California case, "[n]one of these procedures were followed as required." *Chevron*, 2019 WL 4729467 at *6. Instead of pursuing an *ad hoc* arbitration in Holland, the petitioners unilaterally commenced an institutional arbitration in Egypt through the IAC over the objections of all of the respondents, including Saudi Aramco. *Id*. The makeup of the arbitral panel did not conform to the requirements of the arbitration clause, as the arbitrators and umpire were not properly selected; "[t]here were multiple resignations of appointed arbitrators, some in protest of the proceedings, and a rotating cast of arbitrators filled the positions vacated by others." *Id*. Most alarmingly of all, the tribunal issued an opinion holding that it lacked jurisdiction over the dispute, then, with different members, reopened the arbitration and issued a second opinion holding not only that it had jurisdiction but that the petitioners were entitled to $18 billion. *Id*. The record in this case supports every one of Judge White's findings under Article V(1)(d) in the California case, and this Court seconds those findings.

The IAC proceeding did not conform to the procedures outlined in the 1933 agreement's arbitration provisions. Accordingly, under Article V(1)(d) of the Convention, the Court refuses to confirm the petitioners' arbitration award.

---

[7] As previously noted, it seems that the phrase "award of the arbitrators" in this sentence should read "award of the umpire."

## CONCLUSION

The Court will not confirm the petitioners' arbitration award under Articles V(1)(c), V(1)(d), and V(2) of the Convention, irrespective of whether the respondent is Saudi Aramco or any other party. The petitioners' motion to confirm their award (Dkt. 108) is **DENIED**, and this matter is **DISMISSED**. All other motions are denied as moot. The Court will issue a final judgment simultaneously with this opinion.

SIGNED at Houston, Texas, this 17th day of November, 2020.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE